UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

CHARLES EDWARD PICKETT, JR.,

                 Petitioner,

v.

RANDEE REWERTS,

                Respondent.

_____/

Case No. 1:22-cv-1081

Honorable Ray Kent

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Petitioner consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 6.) Section 636(c) provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c).

This case is presently before the Court for preliminary review pursuant to 28 U.S.C. § 2253 and Rule 4 of the Rules Governing § 2254 Cases. The Court is required to conduct this initial review prior to the service of the petition. Rule 4, Rules Governing § 2254 Cases.

Service of the petition on the respondent is of particular significance in defining a putative respondent's relationship to the proceedings. "An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any

procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351.

Rule 4, by requiring courts to review and even resolve the petition before service, creates a circumstance where there may only be one party to the proceeding—the petitioner. Because Respondent has not yet been served, the undersigned concludes that Respondent is not presently a party whose consent is required to permit the undersigned to conduct a preliminary review of the petition. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent from the defendants[; h]owever, because they had not been served, they were not parties to th[e] action at the time the magistrate entered judgment.").[1] Petitioner's consent is sufficient to permit the undersigned to conduct the Rule 4 review.

The Court conducts a preliminary review of the petition under Rule 4 to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, Rules Governing § 2254 Cases; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134,

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

141 (6th Cir. 1970) (discussing that a district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436–37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court will dismiss the petition for failure to raise a meritorious federal claim.

### Discussion

## I.      Factual allegations

Petitioner Charles Edward Pickett, Jr., is incarcerated with the Michigan Department of Corrections (MDOC) at the Carson City Correctional Facility, Carson City, Michigan. Following a jury trial in the Kalamazoo County Circuit Court, Petitioner was convicted of five counts of second-degree murder, in violation of Mich. Comp. Laws § 750.317, five counts of operating while intoxicated causing death, in violation of Mich. Comp. Laws § 257.652(4), and four counts of operating while intoxicated causing serious injury, in violation of Mich. Comp. Laws § 257.625(5)(a). On June 11, 2018, the court sentenced Petitioner to sentences for each group of counts, to run concurrently to each other. On each of the five second-degree murder convictions, the court sentenced Petitioner to concurrent terms of imprisonment of 35 to 55 years. On each of the four "operating while intoxicated causing serious injury" convictions, the Court sentenced Petitioner to concurrent terms of imprisonment of 3 to 5 years.[2] On each of the five "operating while intoxicated causing death" convictions, the court sentenced Petitioner to consecutive terms

---

[2] Petitioner has served the full term of these sentences and has been discharged. MDOC Offender Tracking Information System (OTIS), https://mdocweb.state.mi.us/otis2/otis2profile.aspx? mdocNumber=485575 (last visited Jan. 9, 2023).

of imprisonment of 8 to 15 years. Because the last group of sentences is consecutive, it yields the controlling string of sentences, totaling 40 to 75 years.

The Michigan Court of Appeals recounted the underlying facts as follows:

On June 7, 2016, at around 6:00 p.m., the bicycling organization Chain Gang met for their scheduled evening ride. Jennifer Johnson, the ride leader for the evening, led a group of nine bicyclists along a route that they had cycled several times before. Paul Runnels, another of the cyclists, heard members of the group announce "car back," a phrase used to alert the members of the group that a vehicle was approaching from behind. The vehicle approaching was a pickup truck being erratically driven by Pickett. Moving at approximately 58 miles per hour in the 35 mile per hour zone, and without braking, Pickett crashed into the group of cyclists, killing Tony Nelson, Suzanne Sipple, Deb Bradley, Larry Paulik, and Melissa Fevig-Hughes, and severely injuring Johnson, Runnels, Paul Goble, and Sheila Jeske.

Pickett was arrested at the scene and, because he was "out of it" and appeared to be under the influence of something, he was taken to the hospital. He tested positive for amphetamine, methamphetamine, hydrocodone, and tramadol, and a witness testified before the crash she saw Pickett swallow a "pool of pills." He then stated that he would just as soon be dead before driving away by "burnin' his tires." A laboratory doctor for the Michigan State Police Toxicology Laboratory testified that Pickett's level of methamphetamine was above therapeutic levels and, in any case, it was extremely rare to have a prescription for methamphetamine. She explained how methamphetamine use, as a stimulant, could result in increased heart rate, blood pressure, agitation, excitement, impulsivity, and recklessness. Ultimately, she opined that the combined use of tramadol, cyclobenzaprine, and methamphetamine would likely result in "difficulty processing what's going [on] around you."

Other witnesses testified that before the crash, they observed or were endangered by Pickett's driving. One witness recounted hearing someone scream "watch out," so he jumped back and was able to avoid being hit by Pickett. This witness saw Picket[t] crash into the cyclists. Another witness stated that Pickett tailgated him, swerving back and forth, and then passed him on the shoulder of the road; he added that Pickett's truck was close enough that he could have reached out the window and touched it. A third witness testified that he saw Pickett's truck remain at a green light for possibly half a minute before it sped up abruptly and almost drifted off the road because two of its tires went over a curb. A fourth witness observed Pickett driving erratically, crossing over both lanes, hitting the curb, and disrupting traffic. When that witness tried to get Pickett's license plate number, Pickett sped through the parking lot of a daycare to avoid him. A fifth witness testified that Pickett nearly rear-ended him, and he recounted that he could see leaves and sticks in the truck's grill. A sixth witness recalled that Pickett had driven onto his front yard, knocking over a bicycle chained to a tree and leaving

4

tire marks on his driveway and yard. Finally, another witness testified that she saw Pickett drive across a sidewalk and crash into a sign before coming to a rest next to the driveway of Kalamazoo Central High School. She related that the vehicle stayed there for about 5 minutes, and she stated that Pickett "looked very disoriented" "was very fluidly moving, bobbing up and down," and "just seemed very disoriented and very confused." Although multiple witnesses called 9-1-1, Pickett sped into the group of unsuspecting bicyclists, killing five and seriously injuring four others before he could be apprehended.

*People v. Pickett*, No. 344436, 2019 WL 4553480, at *1 (Mich. Ct. App. Sept. 19, 2022). "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

On November 18, 2022, Petitioner filed his habeas corpus petition raising four grounds for relief, as follows:

I.    The use of Mr. Pickett's confession at trial affected his substantial rights.

II.   The denial of counsel at a custodial interrogation is a structural error requiring automatic reversal.

III.  Defendant was denied effective assistance of appellate counsel when counsel raised a Sixth Amendment claim but failed to support the claim with relevant law.

IV.   The trial court's above-guidelines sentence was unreasonable and disproportionate.

(Pet., ECF No. 1, PageID.5–10.) Petitioner raised habeas grounds I and IV on direct appeal. Petitioner raised issues II and III by a motion for relief from judgment in the trial court. Petitioner has exhausted his state court remedies with respect to all four of his habeas grounds and his petition is timely.

## II.   AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a

state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable

facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was

unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III. Discussion

### A. Petitioner's confession (habeas grounds I, II, and III)

Petitioner's first three habeas grounds relate to a custodial interrogation that occurred at the hospital the day after the murders. The Michigan Court of Appeals described the circumstances surrounding that interrogation as follows:

> [T]he record reflects that Pickett was questioned by two police detectives on June 8, 2016. Detective Mattison testified at the suppression hearing that he advised Pickett of his constitutional rights and that when he informed Pickett that he had a right to have a lawyer present, Pickett stated, "I would like that." Mattison testified that he finished advising Pickett of his rights and asked if Pickett was willing to talk. He recounted that Pickett said he "would like to have an attorney present." In response, Mattison told Pickett that "we don't provide [a lawyer]," "handed him a business card," and "told him that if he retains an attorney or if he is assigned an attorney to have his attorney give [the detective] a call and perhaps in the future [they] could sit down and talk." Mattison stated that, at that point, the other detective present, Detective McGehee, asked Pickett "if he was aware why he was being detained." Pickett answered "that he was aware that he was in an accident and that somebody was killed or that he had killed somebody." McGehee then said, "you killed five people . . . ." Mattison recalled that Pickett's "mouth kind of fell open" and that he appeared to be in shock and surprised before he asked, "What did I do, hit a family or something?" Mattison told Pickett that they "couldn't discuss that with him because he had asked for an attorney." At this point, Pickett "made some comments about, well it has already happened, it can't be changed, I might as well talk to you." Thereafter, Pickett made several incriminating

statements, including an admission that he voluntarily ingested numerous drugs before driving.

*Pickett*, 2019 WL 4553480, at *3.

Petitioner challenged the admissibility of the confession. The trial court agreed that Petitioner had invoked his right to have an attorney present. But the trial court concluded that Petitioner then waived that right by initiating communication with the detectives. The trial court thus concluded that there had been no *Miranda* violation so the confession was admissible.

The court of appeals did not agree with the trial court:

> The trial court found that after Pickett invoked his right to have a lawyer present Pickett initiated communication with the detectives so no *Miranda* violation occurred. However, it is clear that immediately after Pickett unequivocally invoked his right to a lawyer, a police detective asked Pickett "if he was aware why he was being detained." Regardless of the officer's reasons for asking that question, it is plain that the question was reasonably likely to elicit an incriminating response. See *id.*; see also *People v. Paintman*, 412 Mich. 518, 529; 315 N.W.2d 418 (1982) ("[I]t is inconsistent with *Miranda* and its progeny for authorities to instigate a reinterrogation of an accused in custody who has clearly asserted the right to counsel."). Accordingly, we conclude that the trial court clearly erred by finding there was no *Miranda* violation in this case.

*Id.* The appellate court did not reverse based on the *Miranda* violation because it concluded that any error was harmless:

> In *Arizona v. Fulminante*, 499 U.S. 279, 285; 111 S. Ct. 1246; 113 L. Ed. 2d 302 (1991), the United States Supreme Court held that a trial court's error in admitting a confession obtained by such a violation is subject to harmless-error analysis. "[I]f it is beyond a reasonable doubt that the jury would have convicted [the] defendant on the basis of untainted evidence, [the] defendant is not entitled to a new trial." *People v. Dendel*, 289 Mich. App. 445, 476; 797 N.W.2d 645 (2010); see also *People v. Mass*, 464 Mich. 615, 640 n 29; 628 N.W.2d 540 (2001).
>
> In this case, although his confession of ingesting pills and using methamphetamine was improperly admitted, the prosecution presented untainted evidence establishing the same facts that Pickett told the police about during his confession. Blood test evidence revealed that Pickett had taken methamphetamine, hydrocodone, tramadol, ketamine, and cyclobenzaprine. The police discovered methamphetamine, as well as pill bottles containing cyclobenzaprine and tramadol, in his truck. Likewise, Pickett's friend testified that she watched him take a "handful" of unidentified pills before speeding away in his truck. Thus, the

> detective's testimony regarding Pickett's statement, although improperly admitted, was entirely cumulative of other evidence presented at trial, and the jury would have convicted Pickett regardless of whether the trial court excluded his statement at trial. See *Dendel*, 289 Mich. App. at 476.

*Id*. Although the court of appeals cited state authority as the source of the "harmlessness" standard, the cases cited derived that standard from United States Supreme Court authority.[3]

Petitioner dedicates a significant portion of his argument regarding the *Miranda* issue to establishing that a *Miranda* violation occurred. (Pet'r's Br., ECF No. 2, PageID.28–36, 43–47.) For purposes of this preliminary review, the Court will accept the state appellate court's determination that Petitioner's *Miranda* rights were violated. But Petitioner must still overcome the state appellate court's further determination that the *Miranda* violation was harmless.

Petitioner's arguments on the harmlessness issue are self-contradictory. By way of background, "[a] structural error 'def[ies] analysis by harmless error standards.'" *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1907–08 (2017) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). In other words, a "structural error" is not subject to harmless error analysis and an error properly subject to harmless error analysis is not a structural error. The two concepts are mutually exclusive. Although Petitioner contends, without supporting authority, that the denial of counsel at a custodial interrogation is a structural error (Pet'r's Br., ECF No. 2, PageID.40), he

---

[3] The court of appeals quoted *People v. Dendel*, 797 N.W.2d 645, 661 (Mich. Ct. App. 2010). The *Dendel* opinion quotes *People v. Mass*, 628 N.W.2d 540, 554 n.29 (Mich. 2001). The *Mass* opinion took the standard from *Neder v. United States*, 527 U.S. 1, 17 (1999). The *Neder* opinion was applying the harmless error rule of *Chapman v. California*, 386 U.S. 18 (1967).

*Chapman* sets out the "harmless error" standard for direct review of constitutional errors. *Fry v. Pliler*, 551 U.S. 112, 116 (2007). It is different than the "harmless error" standard this Court would use on collateral review. That standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), as follows: "an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 631 (internal quotation marks omitted).

also contends, with supporting authority, that such a denial is subject to harmless error analysis. (*Id.*, PageID.36.)

Petitioner's first contention is wrong, based on the authority he cites in support of the second contention: *Fulminante*. *Fulminante* stands for the proposition that the erroneous admission of involuntary confessions is subject to harmless error analysis. 499 U.S. at 306–12. Accordingly, Petitioner's second habeas issue which depends on his assertion that admission of the involuntary confession is structural error is meritless.

Although Petitioner preferred applying the structural error standard to the admission of his involuntary confession, he also argued that the state appellate court's harmlessness determination was erroneous. He claims that the admission of his confession "was incredibly damaging." (Pet'r's Br., ECF No. 2, PageID.37.) But Petitioner does not directly address the findings of the court of appeals, he just disagrees with the result.

 The court of appeals recounted the other evidence that demonstrated that Petitioner voluntarily ingested several drugs before driving:

> Blood test evidence revealed that Pickett had taken methamphetamine, hydrocodone, tramadol, ketamine, and cyclobenzaprine. The police discovered methamphetamine, as well as pill bottles containing cyclobenzaprine and tramadol, in his truck. Likewise, Pickett's friend testified that she watched him take a "handful" of unidentified pills before speeding away in his truck.

*Pickett*, 2019 WL 4553480, at *3. That factual recitation is presumed to be correct. *Shimel*, 838 F.3d at 688. Petitioner could rebut that presumption by clear and convincing evidence. In this instance, however, Petitioner does not contest that the trial record includes all of the testimony referenced by the court of appeals. Nor does Petitioner challenge the court of appeals' determination that the cited evidence rendered Petitioner's confession cumulative.

Petitioner argues that the jury had to decide "[his] state of mind and his culpability for getting in the car and driving," whether he "was under the influence of drugs," and "how the

decisions he made that day to take drugs impacted his driving." (Pet'r's Br., ECF No. 2, PageID.37.) He opines that his involuntary confession that he had taken pills to calm himself down and that the pills made him feel tired answered those questions and, therefore, was damaging. But that is not the standard.

Certainly every confession is damaging. But even damaging evidence can be "harmless" in the context of the entire record. *Fulminante*, 499 U.S. at 310 ("When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt."). The proper inquiry is whether the quantum of evidence absent the improperly admitted confession is so weighty that the confession is insignificant. *See, e.g.*, *Harrington v. California*, 395 U.S. 250, 253 (1969) (stating that "[t]heir evidence, supplied through their confessions, was of course cumulative. But apart from them the case against Harrington was so overwhelming that we conclude that this violation of *Bruton* was harmless beyond a reasonable doubt . . ." and specifically rejecting the view of the *Chapman* minority that the weight of the evidence is immaterial); *Milton v. Wainwright*, 407 U.S. 371, 372–73 (1972) ("Assuming, arguendo, that the challenged testimony should have been excluded, the record clearly reveals that any error in its admission was harmless beyond a reasonable doubt. [citing *Harrington* and *Chapman*] The jury, in addition to hearing the challenged testimony, was presented with overwhelming evidence of petitioner's guilt . . . ."); *Schneble v. Florida*, 405 U.S. 427, 430 (1972) ("In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."); *Brown v. United States*, 411

U.S. 223, 231 (1973) ("The testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury.").

The "harmless error" inquiry adopted by the Supreme Court is precisely the inquiry that the Michigan Court of Appeals conducted: "[I]f it is beyond a reasonable doubt that the jury would have convicted [the] defendant on the basis of untainted evidence, [the] defendant is not entitled to a new trial." *Pickett*, 2019 WL 4553480, at *3. Thus, it cannot be said that the court of appeals applied the wrong standard. Moreover, it is apparent that the state court applied the standard reasonably. The court looked at the evidence—uncontroverted evidence—showing that Petitioner took drugs purposely and showing that Petitioner was under the influence of a number of different drugs when he crashed into the group of cyclists at almost 60 miles per hour.

Petitioner has failed to show that the Michigan Court of Appeals' determination with regard to harmlessness is contrary to, or an unreasonable application of, clearly established federal law. *Brown v. Davenport*, 142 S.Ct. 1510, 1525 (2022) (stating "[w]hen a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable."); *Davis v. Ayala*, 576 U.S. 257, 269 (2015) ("When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'") (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original)). Therefore, he is not entitled to habeas relief on the claim that his confession was improperly admitted.

Petitioner's failure to show that the state court's "harmless error" determination was unreasonable also dooms his last habeas challenge relating to his involuntary confession. Petitioner contends that his appellate counsel was ineffective because counsel failed to properly support a Sixth Amendment challenge to the admissibility of the confession.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The state appellate court's determination that the Confrontation Clause error was harmless under the *Chapman* standard means the error is also necessarily harmless under the lower threshold of *Brecht*. *Fry*, 551 U.S. at 119–20 (describing the *Chapman* standard as "more liberal" to petitioners); *Brecht*, 507 U.S. at 637 (describing the *Brecht* standard as "less onerous" to the State). The determination that any error was harmless under *Brecht* necessarily means that it is not prejudicial under *Strickland*. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (explaining that the *United States v. Agurs*, 427 U.S. 97 (1976) materiality standard, later adopted as the prejudice standard for ineffective assistance of counsel claims, requires the habeas petitioner to make a greater showing of harm than is necessary to overcome the harmless error test of *Brecht*); *see also Wright v. Burt*, 665 F. App'x 403, 410 (6th Cir. 2016) ("[O]ur previous analysis of *Strickland* prejudice applies to the assessment of whether the Confrontation Clause violation was harmless error under *Brecht*."); *Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004) ("Because we find the error to be harmless [under *Brecht*] Bell cannot meet the prejudice requirement of

14

*Strickland* . . . ."); *Kelly v. McKee*, No. 16-1572, 2017 WL 2831019 at *8 (6th Cir. Jan. 24, 2017) ("Because Kelly suffered harmless error [under *Brecht*] at best, he cannot establish that he suffered prejudice [under *Strickland*]."). Therefore, any claim that appellate counsel rendered ineffective assistance when failing to sufficiently challenge the admission of Petitioner's involuntary confession is, necessarily, also without merit because a harmless admission of evidence cannot be prejudicial.[4]

For all of these reasons, Petitioner is not entitled to habeas relief based upon the admission of his involuntary confession.

## B.    An unreasonable and disproportionate sentence (habeas ground IV)

Petitioner next claims that his sentence was unreasonable and disproportionate. In support of that claim, Petitioner cites state appellate court decisions. He does not identify any clearly established federal law that requires that sentences be reasonable or proportionate.

The terms Petitioner uses in his argument—disproportionate and unreasonable—are derived from state court authorities regarding sentencing. *See People v. Milbourn*, 461 N.W.2d. 1 (Mich. 1990); *People v. Steanhouse*, 902 N.W.2d 327 (Mich. 2017). However, "a federal court may issue the writ to a state prisoner 'only on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Note to Rule 4, Rules Governing Habeas Corpus Cases). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5;

---

[4] It is also disingenuous for Petitioner to challenge appellate counsel's failure to properly challenge the admission of the involuntary confession when counsel prevailed on that issue. The court of appeals determined the confession was improperly admitted.

15

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Any claim that the trial court violated the state sentencing guidelines or state sentencing principles is purely a state law claim that is not cognizable on habeas review.

In *Milbourn*, the Michigan Supreme Court held that a sentencing court must exercise its discretion within the bounds of Michigan's legislatively prescribed sentence range and pursuant to the intent of Michigan's legislative scheme of dispensing punishment according to the nature of the offense and the background of the offender. *Milbourn*, 461 N.W.2d at 9–11; *People v. Babcock*, 666 N.W.2d 231, 236 (Mich. 2003). Nearly three decades later, in *Steanhouse*, the Michigan Supreme Court held that a sentencing court's departure from the sentencing guidelines is unreasonable if the court abused its discretion. *Steanhouse*, 902 N.W.2d at 335. The proper test for determining whether the sentencing court abused its discretion, it held, is found in *Milbourn*'s proportionality analysis. *Id*. at 335–37. In other words, a sentence departing from the guidelines is unreasonable if it is disproportionate.

It is plain that *Milbourn*, and thus *Steanhouse*, were decided under state, not federal, principles. *See Lunsford v. Hofbauer*, No. 94-2128, 1995 WL 236677, at *2 (6th Cir. Apr. 21, 1995) ("[Petitioner] argues that the trial court improperly exceeded the state sentencing guidelines and violated the principles of proportionality set forth in [*Milbourn*,] essentially asking the court to rule on a matter of state law which rarely serves as a basis for habeas corpus relief."); *Clarmont v. Chapman*, No. 20-1205, 2020 WL 5126476, at *1 (6th Cir. Jul. 13, 2020) ("[A]ny state law challenge to the reasonableness of [petitioner's] sentence or argument that his sentence is disproportionate under state law is also not cognizable on habeas review."); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994) ("Petitioner's claim that his sentence violates the

16

proportionality principle of *People v. Milbourn* does not state a claim cognizable in federal habeas corpus."). Because this Court has no power to intervene on the basis of a perceived error of state law, *see Wilson*, 562 U.S. at 5; *Bradshaw*, 546 U.S. at 76; *Pulley*, 465 U.S. at 41, Petitioner's claims based on *Milbourn* and *Steanhouse* are not cognizable in a habeas corpus action.

The same reasonableness/proportionality principles are not present in the United States Constitution's Eighth Amendment. That is so despite the fact that the *Milbourn* opinion quotes *Weems v. United States*, 217 U.S. 349, 367 (1910): "It is a 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Milbourn*, 461 N.W.2d at 9. But the quote from *Weems* is somewhat misleading. *Weems* was not an Eighth Amendment case.

At issue in *Weems* was not a sentence imposed by a state, or even the United States, but one imposed by the supreme court of the Philippines. Mr. Weems' crime was making two false entries in a "wages paid" logbook relating to lighthouse services. His punishment for that crime was significant:

> The minimum term of imprisonment is twelve years, and that, therefore, must be imposed for 'perverting the truth' in a single item of a public record, though there be no one injured, though there be no fraud or purpose of it, no gain or desire of it. Twenty years is the maximum imprisonment, and that only can be imposed for the perversion of truth in every item of an officer's accounts, whatever be the time covered and whatever fraud it conceals or tends to conceal. Between these two possible sentences, which seem to have no adaptable relation, or rather in the difference of eight years for the lowest possible offense and the highest possible, the courts below selected three years to add to the minimum of twelve years and a day for the falsification of two items of expenditure, amounting to the sums of 408 and 204 pesos. And the fine and 'accessories' must be brought into view. The fine was four thousand pesetas,—an excess also over the minimum. The 'accessories' we have already defined. We can now give graphic description of Weems's sentence and of the law under which it was imposed. Let us confine it to the minimum degree of the law, for it is with the law that we are most concerned. Its minimum degree is confinement in a penal institution for twelve years and one day, a chain at the ankle and wrist of the offender, hard and painful labor, no assistance from friend or relative, no marital authority or parental rights or rights of property, no participation even in the family council. These parts of his penalty endure for the term of imprisonment. From other parts there is no intermission. His prison bars

and chains are removed, it is true, after twelve years, but he goes from them to a perpetual limitation of his liberty. He is forever kept under the shadow of his crime, forever kept within voice and view of the criminal magistrate, not being able to change his domicil without giving notice to the 'authority immediately in charge of his surveillance,' and without permission in writing. He may not seek, even in other scenes and among other people, to retrieve his fall from rectitude. Even that hope is taken from him, and he is subject to tormenting regulations that, if not so tangible as iron bars and stone walls, oppress as much by their continuity, and deprive of essential liberty. No circumstance of degradation is omitted. It may be that even the cruelty of pain is not omitted. He must bear a chain night and day. He is condemned to painful as well as hard labor. What painful labor may mean we have no exact measure. It must be something more than hard labor. It may be hard labor pressed to the point of pain.

*Weems*, 217 U.S. at 365–66.

The measure of that punishment was not the United States Constitution. In *Weems*, the United States Supreme Court was interpreting the "cruel and unusual" punishment clause of the Bill of Rights of the Philippine Islands. Moreover, the "precept of justice" referenced was not one adopted by the United States Supreme Court or by any court of the islands; it was a belief attributed to persons "who have formed their conception of the relation of a state to even its offending citizens from the practice of the American commonwealths . . . ." *Id.* at 367.

The United States Constitution does not require strict proportionality between a crime and its punishment. *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment." *Marks*, 209 F.3d at 583; *see also Lockyer v. Andrade*, 538 U.S. 63, 77 (2003) (discussing that the gross disproportionality principle applies only in the extraordinary case); *Ewing v. California*, 538 U.S. 11, 36 (2003) (finding that the principle applies only in "the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality" (quoting *Rummel v. Estelle*, 445 U.S. 263, 285 (1980))). A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'" *Austin v. Jackson*, 213 F.3d 298,

18

302 (6th Cir. 2000) (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)). Ordinarily, "[f]ederal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole." *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).

Petitioner was not sentenced to death or life in prison without the possibility of parole, and his sentence falls within the maximum penalty under state law. His sentence does not present the extraordinary case that warrants deeper inquiry into reasonableness and proportionality or that runs afoul of the Eighth Amendment's ban of cruel and unusual punishment. Petitioner is simply not entitled to habeas relief based on his claim that his sentence is disproportionate or unreasonable.

## IV.     Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not

19

conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated: <u>February 9, 2023</u>          <u>/s/ Ray Kent</u>
                                    Ray Kent
                                    United States Magistrate Judge